**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH** | * | |
| **AND SEIZURE OF** | * | |
| | * | |
| **3393 BLAINE STREET, NE** | * | **CASE NO.** _____ |
| **APARTMENT 3B** | * | |
| **WASHINGTON, DC** | * | |
| | * | |
| | * | |
| | * | **UNDER SEAL** |
| | * | |
| | ****** | |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Mark Norris, being duly sworn, depose and state:

1.       I am a Task Force Officer of the United States Secret Service (USSS) and a Detective with the Montgomery County Department of Police (MCDP). I am presently assigned to the USSS Metropolitan Area Fraud Task Force, and have been working with the USSS for three years. Prior to being assigned to the Metropolitan Area Fraud Task Force, I was a detective assigned to the Major Crimes Investigative Section of MCDP for six years, and have been a law enforcement officer for over eighteen years.  I have also held assignments in the 4th District Special Assignment Team (SAT), a covert plain clothes unit, in which I investigated drug-related offenses, and as a District Investigator in the 1st District of MCDP.

2.       I also served as a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), from 2003 through 2005. As such, I attended the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. I am a graduate of the Criminal Investigator Training Program and the Customs Basic Enforcement

School. As a Special Agent with ICE, I gained experience and training in the investigation of money laundering and export violations.

3.      My law enforcement training and experience includes the preparation, presentation, and service of criminal complaints, arrest warrants, and search warrants.  I have also received training and experience in the investigation of complex criminal networks operating both domestically and internationally that are engaged in crimes such as money laundering, wire fraud, aggravated identity theft, and bank fraud.  In my experience, I have used electronic surveillance methods, the review of electronic communications records, as well as information derived from conspirators' social media accounts, such as Facebook and Instagram, to gather information in support of proving a criminal conspiracy.

4.      As a result of these investigations, I also have experience in debriefing defendants, informants, participants, and various persons directly involved in such criminal conspiracies.  In addition to debriefings of cooperating defendants and confidential informants to gather intelligence, I have also utilized them to directly target criminal organizations through undercover operations in order to gather direct evidence of their illicit activities.

5.      I have experience and detailed knowledge of the types of documentary evidence that can be gathered and utilized in the investigation of financial crimes, such as money laundering, bank fraud, wire fraud, and aggravated identity theft. Such documents include bank records, records from money services bureaus, wire transfer detail, shipping records, and other documents.  I have extensive experience in the analysis and utilization of the aforementioned types of records in pursuit of prosecuting these crimes.

6.      Based upon my training and experience, I know that those engaged in conspiracies related to financial crimes routinely use their residences to plan and organize their

2

crimes.  In addition, suspects often store and conceal evidence of these crimes in their residences. This evidence includes, but is not limited to, documentary evidence such as bank statements, bank counter slips, records of fund transfers through money services bureaus, checks, receipts, debit and credit cards, and other documents containing the personal identifying information (PII) of victims, such as account numbers, names, addresses, dates of birth, social security numbers, and telephone numbers.

7.      Furthermore, my experience and training has shown that conspirators engaged in financial crimes often use a variety of electronic devices such as mobile telephones, iPads, tablets, laptop computers, desktop computers, and digital storage media (i.e. thumb drives and compact disks) to facilitate these crimes.  These devices can be used to gather and store the PII of victims; monitor targeted financial accounts via the internet; coordinate the conspiracy through the use of phone calls, emails, text and photo messages; to monitor social media accounts and utilize the private messaging features contained within to coordinate and plan their crimes; and to aid in the manufacture of counterfeit documents, credit cards, and identification cards.  Such electronic devices are routinely closely kept in the possession of suspects and are often found in their residences upon execution of search warrants.

8.      The statements in this affidavit are based on my personal knowledge and observations during the course of this investigation; information observed by or known to other law enforcement agents that they conveyed to me; information gained from Wells Fargo Bank investigators; my personal review of records, documents, and other physical evidence obtained during the investigation; and information gained through my training and experience. I have not included each and every fact known to me concerning this investigation.

9.      This affidavit is submitted in support of search and seizure warrants for the TARGET RESIDENCE located at **3393 Blaine Street, NE, Apartment 3B, Washington, District of Columbia** (hereinafter referred to as the "**TARGET RESIDENCE**" and more fully described in Attachment A).

10.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **TARGET RESIDENCE** was used in the commission of a crime and contains evidence of violations of 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C § 1028A (Aggravated Identity Theft).

## PROBABLE CAUSE

Accounts of T.O. and S.B.

11.     On August 10, 2016, at approximately 3:30 pm, two males entered the Quince Orchard branch store of Wells Fargo Bank, located at 12161 Darnestown Road, Gaithersburg, Maryland, and contacted branch manager Kevin CAPERS.  A Maryland driver's license in the name of Kadeem HASTINGS was presented by one of the two men at the meeting.  During the course of the meeting, CAPERS added HASTINGS as a joint account holder for an account ending in 7481 ("account 7481"), belonging to T.O. of Fort Washington, Maryland.

12.     Once added to the account, the person identified as HASTINGS requested a $17,000 withdrawal from account 7481.  A portion of this withdrawal, $5,000, was used to open a sole owner account for HASTINGS, with an account number ending in 3058 ("account 3058"). The person identified as HASTINGS took the remaining $12,000 withdrawal in cash.  CAPERS also provided the person identified as HASTINGS with a debit card linked to account 3058. This card was later used to make an ATM withdrawal in the amount of $2,000 from account 3058.

13.     At approximately 4:02 pm—just a short time after the opening of account 3058 and while the two men were still inside the Quince Orchard branch store—a third suspect also representing himself as HASTINGS ("S3") entered the Brandywine Station branch store of Wells Fargo Bank, located at 16000 Crain Highway, Brandywine, Maryland.   S3 requested an $18,000 withdrawal from account 7481 from bank teller G.M.  G.M. processed the request and provided S3 two cashier's checks made payable to HASTINGS, each in the amount of $9,000.

14.     T.O. later contacted Wells Fargo Bank to report that he had not authorized the addition of HASTINGS to his account.  He reported not knowing HASTINGS and that all transactions associated with HASTINGS were fraudulent.  T.O. claimed not to have been to the Quince Orchard branch store where the transactions had occurred.  The total loss associated with the fraud against T.O.'s account is $61,000.

15.     Also on August 10, 2016, two females entered the Quince Orchard branch store and contacted CAPERS.  This occurred shortly after HASTINGS left the branch.  A Maryland driver's license in the name of Shanay DANFORTH was presented by one of the two women at the meeting.  During the course of the meeting, CAPERS added DANFORTH as a joint account holder for an account ending in 7629 ("account 7629") belonging to S.B. of San Francisco, California.

16.     At the time the person identified as DANFORTH was added to the account of S.B., she requested a cash withdrawal of $18,000 from CAPERS.  CAPERS took the withdrawal slip to one of his employees, J.B.  J.B. processed the withdrawal in the name of DANFORTH.  One of the two females received the $18,000 cash withdrawal, and the two females subsequently left the bank.

17.     Additional fraudulent transactions were completed in the name of DANFORTH against account 7629.  S.B. later contacted Wells Fargo to report she had not been in Maryland, nor had she authorized the addition of DANFORTH to the account.  S.B. further stated that she (S.B.) had not authorized any of the withdrawals made by DANFORTH.  The total fraud loss associated with these transactions made against account 7629 is $60,000.

Brandon DICKERSON Participation

18.     Wells Fargo bank received an additional claim of fraud subsequent to the two above-reported incidents.  A.A. of Richmond, Virginia, contacted Wells Fargo to report that on August 6, 2016, his Wells Fargo account ending in 3632 ("account 3632") had been targeted for fraud.  An individual purporting to be A.A. made two cash withdrawals from account 3632 totaling $28,500.  In addition, five cashier's checks each in the amount of $5,000, totaling $25,000, were issued from account 3632.  When A.A. learned of these withdrawals, he (A.A.) contacted Wells Fargo to report the fraud.

19.     A Wells Fargo customer named Brandon DICKERSON of Bryans Road, Maryland, has been identified as a possible suspect.  DICKERSON contacted Wells Fargo Bank about his personal account ending in 1848 ("account 1848") from telephone number (443) 756-0165 to request a credit line increase on his Wells Fargo account on December 31, 2015.  The calling number was recorded through Wells Fargo Bank's Automated Number Identifier ("ANI") system.  This system records calls made to Wells Fargo's telephone banking system and the numbers are directly associated with the accounts about which customers call.

20.     On October 11, 2016, an Inspector of the United States Postal Inspection Service confirmed that both CAPERS and DICKERSON are receiving mail at a common address: 250 American Way, Apartment 628, Oxon Hill, Maryland.

21.     In connection with two criminal cases, DICKERSON reported his home address to be 6600 Captain Johns Court, in Bryans Road, Maryland.

22.     I obtained prior arrest photographs of DICKERSON from the Charles County Sheriff's Office.   Upon comparison to the video surveillance photographs from Wells Fargo Bank, DICKERSON matches the appearance of the person making the fraudulent withdrawal from account 3632, belonging to A.A.   In addition, I conducted a search of Thomson-Reuters's CLEAR database, and determined phone number (443) 756-0165 has in the past been associated with DICKERSON.   Most recently, this number was linked to a utility account associated with DICKERSON on May 18, 2016, at an address in Oxon Hill, Maryland.

23.     Phone number (443) 756-0165 was also used to make inquiries on additional Wells Fargo Bank accounts to which DICKERSON has no connection.   Wells Fargo records indicate that someone using the number (443) 756-0165 made an unauthorized inquiry on Wells Fargo customer M.H.'s account through the telephone banking system on July 7, 2016.   M.H. was alerted to this inquiry by Wells Fargo bank security.  M.H. confirmed that M.H. had not made the call, nor had she authorized anyone to inquire on her Wells Fargo account.   M.H. then closed the account.   Additionally, Wells Fargo investigators reported to me that CAPERS viewed M.H's account prior to the reported suspicious inquiry.   CAPERS reviewed M.H.'s account on June 22, 23 and 24.

24.     I also reviewed records associated with the T-Mobile cellular telephone account subscribed to CAPERS, phone number (704) 807-7156.   Review of the call data records associated with this account indicated that 635 cellular telephone calls took place between CAPERS and the number associated with DICKERSON, (443) 756-0165, beginning in early 2015 and continuing through at least August 18, 2016.

CAPERS's Viewing of Compromised Accounts

25.    Only one Wells Fargo employee, CAPERS,  had viewed account 3632, account

7481, and account 7629 prior to the fraud on those accounts:

a.  Wells Fargo internal computer tracking records indicate CAPERS viewed account 7481, belonging to T.O., three times on August 4, 2016, at approximately 6:30 pm, with no apparent business purpose.  This was done from a Wells Fargo work station at the Quince Orchard branch in Gaithersburg, Maryland.  At that time, T.O. was not present.

b.  On August 9, 2016, one day before the fraud on account 7629, CAPERS viewed account 7629, belonging to S.B., at approximately 11:00 am from a work station at the Quince Orchard branch store of Wells Fargo, with no apparent business purpose.  S.B. was not present when CAPERS viewed the account.

c.  On August 6, 2016, CAPERS viewed account 3632, belonging to A.A., from a work station at the Quince Orchard branch store of Wells Fargo Bank. CAPERS viewed account 3632 beginning at 9:29 am and reviewed it periodically throughout the day until the time the fraudulent transactions occurred, after 1:00 pm.    A.A. was not present at the time CAPERS viewed the account.

26.    Additional victims have contacted Wells Fargo Bank to report they have been

victims of a similar fraud scheme:

a.  Victim A.B. of Mountain View, CA, was the victim of fraud against a Wells Fargo Bank account ending in 7572, with a loss amount of $2,000, occurring on June 29, 2016; the account was viewed by CAPERS on June 23, 2016;

b.  Victim P.R. of Marriottsville, MD, was the victim of fraud against a Wells Fargo Bank account ending in 7856, with a loss amount of $33,000, occurring on July 25, 2016; the account was viewed by CAPERS on July 20, 2016, and again on August 4, 2016;

c.  Victim B.B. of Upper Marlboro, MD, was the victim of fraud against a Wells Fargo Bank account ending in 7014, with a loss amount of $18,104, occurring on August 10, 2016; the account was viewed by CAPERS on July 18, 2016;

d.  Victim D.S. of Rockville, MD, was the victim of fraud against a Wells Fargo Bank account ending in 7898, with a loss amount of $32,398, occurring on July 20, 2016; the account was viewed by CAPERS on July 18, 2016;

e.  Victim M.S. of Kernersville, NC, was the victim of fraud against a Wells Fargo Bank account ending in 7572, with a loss amount of $42,185, occurring on July 2, 2016; the account was viewed by CAPERS on June 29, 2016.

Additional Investigation

27.     On August 10, 2016, law enforcement responded to the Quince Orchard branch store of Wells Fargo Bank to serve a subpoena for the account of D.S. of Rockville, Maryland, referenced above.  Law enforcement provided the subpoena to a branch employee who said he/she would pass it on to the branch manager, CAPERS.

28.     CAPERS resigned from Wells Fargo that same day, August 10, 2016.  On September 16, 2016, E.S., a former co-worker of CAPERS at the Wells Fargo Bank Quince

Orchard branch store, reported that on August 10, 2016, the branch was preparing for an annual audit. As this day approached, CAPERS repeatedly stated to E.S. that he (CAPERS) planned to quit. At the end of the day on August 10, 2016, CAPERS pulled E.S. aside and told E.S. that he (CAPERS) had hidden his branch keys in the ATM closet and would not be returning to work. CAPERS further stated he (CAPERS) would be sending a letter of resignation to the district manager.

29.     CAPERS reported to his previous employer, Wells Fargo Bank, that his home address was that of the **TARGET RESIDENCE**.

30.     On September 9, 2016, an Inspector of the United States Postal Inspection Service confirmed that CAPERS was receiving mail at the **TARGET RESIDENCE**.

31.     On July 14, 2016, CAPERS purchased a black Dodge Challenger from Ourisman Motors in Montgomery County, Maryland. On September 15, 2016, a black Dodge Challenger bearing Maryland temporary tag 877603T was parked adjacent to the **TARGET RESIDENCE**. A computer check of Maryland Motor Vehicle Administration ("MVA") records indicated that temporary tag 877603T is registered to CAPERS.

32.     At approximately 5:22 pm on September 15, 2016, members of law enforcement observed CAPERS exit the **TARGET RESIDENCE** and walk to the above-referenced Dodge Challenger and enter the vehicle.

33.     On the morning of October 19, 2016, a member of law enforcement again observed CAPERS's black Dodge Charger parked outside of the **TARGET RESIDENCE**.

34.     A search of the Thomson-Reuters CLEAR database indicated that both utility companies and Experian have reported CAPERS to reside at the **TARGET RESIDENCE** as recently as July 2016.

## SEARCH OF ELECTRONIC INFORMATION

38.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET RESIDENCE, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found on the TARGET RESIDENCE, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a. Individuals who engage in criminal activity, including violations of 18 U.S.C.
§ 1344 (Bank Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C § 1028A
(Aggravated Identity Theft) and the manner in which digital devices may be
used in the commission of those offenses, not only use computers to access
websites used for illegal activity and to communicate with co-conspirators
online, but that they also store documents and records relating to their illegal
activity on computer hard drives and other electronic storage media. Criminals
store these documents and records, which can include logs of online "chats"
with co-conspirators; email correspondence; contact information of co-
conspirators, including telephone numbers, email addresses, identifier for
instant messaging and social medial accounts; stolen financial and personal
identification data, including bank account numbers, credit card numbers, and
names, addresses, telephone numbers, and social security numbers of other
individuals; and records of illegal transactions using stolen financial and
personal identification data, to, among other things, (1) keep track of co-
conspirator's contact information; (2) keep a record of illegal transactions for
future reference; (3) keep an accounting of illegal proceeds for purposes of,
among other things, splitting those proceeds with co-conspirators; and (4)
store stolen data for future exploitation.

b. Individuals who engage in the foregoing criminal activity, in the event that
they change computers, will often "back up" or transfer files from their old
computers' hard drives to that of their new computers, so as not to lose data,

including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.   Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was

downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

40. *Forensic Evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the TARGET RESIDENCE because:

  a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but

has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file

creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.  I know that when an individual uses a digital device to commit bank fraud, wire fraud or identity theft, the individual's device will generally serve both as

an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

41.    *Methods To Be Used To Search Digital Devices.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with

specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the TARGET RESIDENCE.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

d. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular

use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a

computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.   Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably

appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

  i.  Upon securing the TARGET RESIDENCE, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the TARGET RESIDENCE.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

  ii.  The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may

include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the seized electronic storage media or

digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## **CONCLUSION**

42.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the **TARGET RESIDENCE** was used in the commission of a crime and contains evidence of violations of 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C § 1028A (Aggravated Identity Theft).  As such, I request a warrant to search **TARGET RESIDENCE** as described in Attachment A for items and information further described in Attachment B.


_____
Mark Norris
Task Force Officer, USSS




Subscribed to and sworn to me this \_\_\_\_ day of November, 2016.



_____
Honorable G. Michael Harvey
United States Magistrate Judge